## Walter S. Hale *et al.*

*v.*

## Ruth C. Hale *et al.*

*Filed at Ottawa March 31, 1893.*

1. Wills—*construed as giving executors the title in fee.* A testator appointed his wife and three others as the executors and trustees of his will, and after making various specific devises of money, and annuities for the lives of the donees, he directed that the residue of his estate be and remain in the care and control of his executors and trustees and their successors, well and safely invested, until the decease of the last survivor of the life annuitants named in the will, and that then the said residue, with all the accumulated interest thereof, be divided equally among his grandchildren *per stirpes,* but made no express devise of his lands in this State to his executors, or to any one else : *Held,* that the legal title to such lands vested in his executors and trustees, subject to the conditions and trusts declared by the will, and that the use of the word "trustees," and the appointment of his executors to that position, affords a strong indication of his intention that his executors, after performing the duties of administration, should continue to hold the estate for the beneficiaries, not merely as custodians, but as trustees of an express active trust.

2. The duty of the trustees in such case involves more than merely keeping the estate invested in such real and personal property as shall be least subject to deterioration or loss, without reference to the production of an income. Their duty is obviously to keep the estate invested in such way as not only to be safe, but so as to make it produce at least a reasonable income. This duty, so far as the real estate is concerned, involves the power to lease, and perhaps the power to improve, or make such other use of it as prudent business management will suggest for the purpose of obtaining from it rents and profits. Such duties constitute them trustees of an express active trust, and clothe them with the legal title.

3. Where land is conveyed or devised to trustees, and they have active duties to perform, they will take the legal estate. The converse is also generally true, that when active duties are prescribed for executors which can not be performed unless the legal estate is vested in them, they are in fact made trustees, and take the legal estate for the purposes of the trust.

4. Although no trust is declared in express terms, or even mentioned, still the intention of the donor to create the trust, and the existence of the trust itself, may be necessarily inferred from the powers given to the grantee ; and in case of wills, even where no estate is

directly devised to the executors, but the whole estate is apparently given to the beneficiaries, the trust may be inferred from the powers conferred on the executors, and thus, from a construction of the whole will, the intention may be shown that the executors are to take the legal title as trustees of an express active trust.

5. The rule is familiar, that where a will contains no words expressly creating a trust, or devising the legal title to executors or trustees, such devise may be implied when the powers conferred and duties imposed on the executors are of such a character that a legal title is necessary to their proper exercise or performance.

6. The doctrine is settled, that in dispositions of such a nature, although there is no devise in terms to them, the authority conferred by the will upon the executors to lease, rent, repair, insure, pay taxes, assessments and interest, and otherwise control the trust property, and to pay over the net income to the devisees, necessarily carries the legal title to the executors, and creates an express active trust in them.

7. CHANCERY—*jurisdiction over estates of infants.* A court of equity has jurisdiction to authorize a sale of real estate held in trust for infants or other persons under disability, and the re-investment of the proceeds, whenever it appears that it will be for the best interests of the trust estate that such sale and re-investment shall be made.

8. The power of courts of chancery, by virtue of their general jurisdiction over the estates of infants, to authorize the conversion of their real estate into personalty when it is clearly for their interest, is not only supported by the general current of authority in this country, but is so well settled in this State as to be no longer an open question.

9. SAME—*decree against infants—strict proof required.* To sustain a decree against infant defendants, all the facts necessary to justify it must be alleged and strictly made out by the evidence, without regard to the admissions and concessions of the adult co-defendants.

10. SAME—*parties—decree binding on persons not in esse.* Where a testator invests his executor with the legal title to land as trustee, in trust for his grandchildren that may be living at a future day, as, on the death of the survivor of several other persons to whom he has devised annuities for their lives, on bill by the trustee for leave to sell the land and re-invest the proceeds it will be sufficient to make all persons *in esse* at the time of filing the bill, who have an interest in the estate, parties defendant, and a decree ordering such sale and re-investment will be binding on grandchildren who may thereafter be born, as their interests are identical with those in being.

11. SAME—*service of process by copy of bill, on infant non-residents.* Section 14, chapter 22, entitled "Chancery," which provides for service on defendants residing or being without this State, by the delivery of a copy of the bill and notice of the commencement of the suit, applies to and includes non-resident infants who are sued, as well as adults.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. ELLIOTT ANTHONY, Judge, presiding.

Messrs. HAMLIN, HOLLAND & BOYDEN, and Mr. SIDNEY SMITH, for the plaintiffs in error:

Did the court acquire jurisdiction of the persons of the defendants? The master's report and decree find that the infants were served with notice of the commencement of the suit and a copy of the bill, as required by the section of the statute providing for service on non-residents. Rev. Stat. sec. 14, chap. 22.

Has a court of chancery jurisdiction of a bill filed by a trustee to authorize the sale of real estate held in trust for infants, when it appears that it will be for the best interests of the trust estate that such sale and re-investment should be made? This jurisdiction has apparently been denied. Tyler on Infancy, 299; *Rogers* v. *Dill*, 6 Hill, 415; *Baker* v. *Holland*, 4 Com. 257; *Onderdonk* v. *Mott*, 34 Barb. 107.

Is it an objection to the decree for the sale and conveyance of the property and re-investment of the proceeds, that other grandchildren not now in being may have an interest in the residuary estate? The following authorities seem to hold that the grandchildren not *in esse* can not be barred by the decree: *Downin* v. *Spucher*, 35 Md. 484; *Long* v. *Long*, 62 id. 35.

Messrs. HERRICK & ALLEN, for the defendants in error:

It is a familiar doctrine, that where land is conveyed or devised to trustees, and they have active duties to perform, they take the legal estate. The converse is generally true, that where active duties are prescribed for executors which could not be performed unless the legal estate is vested in them, they are, in fact, made trustees, and necessarily take the legal estate for the purposes of the trust. *Betts* v. *Betts*, 4 Abb. N. C. 384; *Tobias* v. *Ketchum*, 32 N. Y. 319; *Brewster* v. *Striker*, 2 Comst. 19; *Bradley* v. *Amidon*, 10 Paige, 235;

*Leggett* v. *Perkins,* 2 Comst. 197; *Killam* v. *Allen,* 52 Barb. 605; *Marx* v. *McGlynn,* 88 N. Y. 357; *Vail* v. *Vail,* 7 Barb. 226; *Zabriskie* v. *Railroad Co.* 6 Stew. Eq. 22; *Boyd* v. *Talbert,* 12 Ohio, 212; *Deering* v. *Adams,* 37 Me. 264; *Craig* v. *Craig,* 3 Barb. Ch. 76; *Lindley* v. *O'Reilley,* 21 Vroom, 636; *Roberts* v. *Roberts,* 1 Disney, 177. And the English cases are to the same effect. *Oates* v. *Cooke,* 3 Burr. 1684; *Anthony* v. *Rees,* 2 Cr. & Jer. 75; *Davies* v. *Jones,* 24 Ch. D. 190.

Thus, provisions in a will giving executors "the management and direction" of the testator's real estate, or directing them "to take charge of," and "take care of, manage and improve," such real estate, or to have control of the same, or that the real estate should remain and be kept under the care and management of the executors, although the will contains no express words of devise to them. 2 Pomeroy's Eq. Jur. sec. 1011; *Bradley* v. *Amidon,* 10 Paige, 235; *Leggett* v. *Perkins,* 2 Com. 197, and cases *supra.*

So, also, where a will confers on executors powers to lease and collect the rents of real estate, and to repair and insure, they take the legal title to the same, to enable them to effectually execute the trust, although the will contains no express devise to them. 2 Pomeroy's Eq. Jur. sec. 1011; *Tobias* v. *Ketchum,* 32 N. Y. 319; *Killam* v. *Allen,* 52 Barb. 605; *Boyd* v. *Talbert,* 12 Ohio, 212; *Brewster* v. *Striker,* 2 Comst. 19.

The particular facts and full reasoning in the following authorities, *supra,* are especially pertinent in the case at bar: 2 Pomeroy's Eq. Jur. sec. 1011; *Tobias* v. *Ketchum,* 32 N. Y. 319; *Brewster* v. *Striker,* 2 Comst. 19; *Leggett* v. *Perkins,* id. 197; *Betts* v. *Betts,* 4 Abb. N. C. 384; *Marx* v. *McGlynn,* 88 N. Y. 357; *Boyd* v. *Talbert,* 12 Ohio, 212.

A court of chancery has jurisdiction to authorize a sale of real estate held in trust for infants or other persons under disability, and the re-investment of the proceeds, whenever it appears that it will be for the best interest of the trust estate that such sale and re-investment should be made. This court

has directly affirmed the jurisdiction in the following cases:
*Smith* v. *Sackett,* 5 Gilm. 534; *Curtiss* v. *Brown,* 29 Ill. 201;
*Dodge* v. *Cole,* 97 id. 338; *Longwith* v. *Riggs,* 123 id. 258;
*Allman* v. *Taylor,* 101 id. 185. And the following cases in
other jurisdictions are to the same effect: *Matter of Salisbury,*
3 Johns. Ch. 347; *Snowhill* v. *Snowhill,* 3 N. J. Eq. 22; *An-*
*derson* v. *Mather,* 4 N. Y. 249; *Goodman* v. *Winter,* 64 Ala.
410; *Cochran* v. *Van Surlay,* 20 Wend. 375; *Wood* v. *Mather,*
38 Barb. 473; *Pitcher* v. *Carter,* 4 Sandf. Ch. 1; *Stapleton*
v. *Langstaff,* 3 Dess. 22; *Rivers* v. *Durr,* 46 Ala. 418; *Frith*
v. *Cameron,* L. R. 12 Eq. 169; *Ex parte Jewett,* 16 Ala. 409;
*In re Household,* 27 Ch. D. 553.

It is no objection to the decree for the sale and conveyance
of the property and the re-investment of the proceeds, that
other grandchildren not now in being may have an interest in
the residuary estate. Calvert on Parties, 19-21; *Gifford* v.
*Hort,* 1 Sch. & Lef. 386; *Reynoldson* v. *Perkins,* Amb. 564;
*Finch* v. *Finch,* 2 Ves. Sr. 491; *Leonard* v. *Sussex,* 2 Vern.
527; *Wills* v. *Slade,* 6 Ves. 498; *Van Lew* v. *Parr,* 2 Rich.
Eq. 321; *Bofil* v. *Fisher,* 3 id. 1; *Baylor* v. *De Jarnette,* 13
Gratt. 152; *Faulkner* v. *Davis,* 18 id. 651; *Mead* v. *Mitchell,*
17 N. Y. 210.

Mr. W. H. SWIFT, and Messrs. SWIFT, CAMPBELL, JONES &
MARTIN, for Natalie B. Hale and others.

Mr. CHIEF JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by the executors and
trustees under the will of Ezekiel J. M. Hale, deceased, pray-
ing for a decree authorizing them to sell certain lands be-
longing to the estate of their testator, situate in Cook county,
Illinois, and hold and re-invest the proceeds upon the trusts
declared in the will, on the ground that such sale and re-invest-
ment is for the best interest of the estate, and of all persons
interested therein. The testator, who, prior to his death, was

a resident of Haverhill, Massachusetts, died June 4, 1881, leaving a large estate, consisting of real and personal property situate in the State of Massachusetts, also of lands of very considerable value situate in the State of New York, and the lands in question in this suit situate in this State. His will was admitted to probate by the Probate Court of the county of Essex, in the State of Massachusetts, July 8, 1881.

The will, a copy of which is appended to the bill as an exhibit, consists of twenty-three paragraphs or clauses, and by the first clause, the testator constituted and appointed his wife, Ruth C. Hale, and John L. Hobson, Henry H. Hale and Elbridge G. Wood, executors and trustees of his last will and testament. The second clause provided for closing up the manufacturing business established by the testator at Groveland, Essex county, Massachusetts, and the sale of the same, and of the real estate connected therewith, and of all his real estate in Groveland, except the parsonage house used by St. James Episcopal Church, the proceeds to remain in the hands of his executors and trustees, subject to the dispositions and provisions of the will thereinafter made.

The third clause provided for the payment to the testator's mother during her life, of an annuity of $800, and gave her the use for life of the house then occupied by her, with remainder for life to two of the testator's sisters, the house and land, at their decease to be disposed of with the residue of his estate. The fourth clause gave to the testator's widow the sum of $10,000, to be paid at his death, and an annuity for life of $12,000, and the use for life of the homestead and the furniture and other property belonging thereto, the homestead property, at her decease, to be disposed of with the rest and residue of his estate, the provision in favor of his widow to be accepted by her as being in full of her dower and all other claims against the estate.

The fifth clause gave to the testator's son, Harry H. Hale, $50,000, to be paid at the testator's death, and the further

sum of $50,000, in case he should survive the testator five years, and also an annuity for life of $4200, and in case of his death, an annuity of $3600 was directed to be paid to his widow and children until the final division of the estate. The sixth clause gave to the testator's son, Samuel C. Hale, $20,-000, payable at the testator's death, and an annuity for life of $3600, and in case of his death, leaving a widow or child surviving him, an annuity of $1200 was directed to be paid to her or them, until the final division of the estate. By the seventh clause the sum of $10,000 was given to the testator's son, Edward Hale, payable to him at the testator's death, if then of the age of twenty-one years, and if not, then payable on his arrival at that age; also the further sum of $20,000 on his attaining the age of twenty-five years, and the further sum of $20,000, on his attaining the age of thirty years, and also an annuity for life of $3600, and in case of his death leaving a widow or child, an annuity of $2400 was directed to be paid to such widow or child until the final division of the estate. The eighth clause gave to the widow of James Frank Hale, a deceased son of the testator, an annuity for life of $3600. It was provided however that the annuities to the widows of his sons should cease, in case of each, upon her marrying again.

The ninth clause gave to the testator's grand-son, Ezekiel J. M. Hale, $10,000, payable when he should attain the age of twenty-five years, and $15,000 when he should attain the age of thirty years, and also an annuity of $1500, commencing at the testator's death, if he should then be twenty-one years of age, and if not, then on his attaining that age, and continuing until the final division of the estate. The tenth clause gave to the testator's grand-son, Benjamin P. Hale, $5000, payable at the testator's decease, if then of the age of twenty-one years, and if not, then on his attaining that age, and also the sum of $10,000 on his attaining the age of twenty-five years, and the further sum of $10,000, on his attaining

the age of thirty years, and also an annuity of $1000 from the testator's death until his arrival at the age of twenty-one years, and an annuity of $1500 from that date until the final division of the estate. The eleventh clause gave to Lucy L. Howe and Mabel G. Howe, two of the testator's grand-daughters, each, the sum of $10,000, on their severally attaining the age of twenty-five years, and $15,000, when they severally attained the age of thirty years, and also an annuity to each of $1000, until they should severally attain the age of twenty-one years, and an annuity of $1500 from that date until the final division of the estate.

The twelfth clause gave to George K. Hale, the testator's brother, an annuity for life of $600, and also an estate for life in a lot of land and the buildings thereon then occupied by him; and it also gave the sum of $10,000, and the remainder in the lot and buildings to his children, if any of them should be alive at his death, but if not, the property was to be disposed of with the residue of the estate. The thirteenth clause gave to Susan C. Ball, Elizabeth Hale and Mary Ann Hale, three of the testator's sisters, an annuity for life of $300, and to Mrs. Adaline Parker and Miss Priscilla Parker, each, an annuity for life of $200. The fourteenth clause gave to William Ford an annuity for life of $200. The fifteenth clause gave to J. Warren Hale and Phebe Hale, an uncle and aunt of the testator, each, an annuity for life of $200. The sixteenth clause gave to Arthur D. Veasey a mortgage on his property held by the testator. The seventeenth clause gave to the American Bible Society $20,000, and to the Home Mission Society and the Haverhill Female Benevolent Society, each, $5000, payable one year after the testator's death. The eighteenth clause gave to the St. James Episcopal Church of Groveland, an annuity of $1000, to be paid until the final division of the estate, and also the house then occupied as a parsonage, and also the sum of $10,000, payable when the annual payment should terminate.

The nineteenth clause gave to the city government of Haverhill the sum of $50,000, the annual income to be appropriated to defraying the current expenses of the Haverhill Public Library, and also the further sum of $50,000, to the trustees of the library the annual income to be appropriated for the purchase of books for the library. The twentieth clause gave to the Inhabitants of South Groveland, the library connected with the Groveland Mills, and also authorized his executors and trustees to appropriate and expend annually, $200 in maintaining and improving that library for the use of the Inhabitants of South Groveland, such appropriation to continue until the final division of the estate. The twenty-first clause directed the executors and trustees to convey to the Haverhill City Hospital, when established, a certain lot of land and the buildings thereon, and also gave to such hospital $50,000, to be used in part for the construction of buildings, and the residue to be held in trust, and the income applied to defraying the current expenses of the hospital.

The twenty-third clause provided that, in the care and custody of the estate, John L. Hobson should act as treasurer, and sign all checks, drafts and orders for the payment of money, and supervise generally the affairs of the estate, and that for his services in that behalf, he should receive, out of the income of the estate, the sum of $4000 per annum, such payment, however, to be made him on condition that he should resign his position as cashier of the Merrimack National Bank, and devote his first thought and attention to the affairs of the estate. It further provided that the number of persons appointed to execute the will and trust should remain as in the will provided, and that in case of vacancy by death or otherwise, such vacancy should be filled by the Judge of Probate of Essex county, and the person thus appointed should have the same power to act as the other persons appointed by the will, and each of the executors and trustees, and each of their successors, was given all the powers and had reposed in him all

the trusts, given to the executors and trustees jointly, provided and so far as he who should act, should have the consent of his associates.    The twenty-second clause is as follows:

"Twenty-second.    As to the residue of all my estate, both real and personal, not herein otherwise disposed of, it is my will that the same be and remain in the care and control of my said executrix and executors and trustees, and their successors, well and safely invested until the decease of the last survivor of the life annuitants named in my foregoing will, and that then the said residue and remainder, with all the accumulated interest thereof, shall be divided equally among my grand-children *per stirpes*, to hold to such grand-children so distributed, and to their heirs, executors, administrators and assigns, forever."

This will was considered by this court in certain of its aspects in *Hale et al.* v. *Hale et al.* 125 Ill. 399.    In that case, the heirs at law of the testator filed their bill in the Superior Court of Cook county for a partition of the lands in this State of which the testator died seized, alleging that these lands were not within the scheme of the will, and that it was not the intention of the testator to dispose of them; and also that the residuary clause above set forth was void, as tending to create a perpetuity, and praying that these lands be declared to be intestate property, and be partitioned among the heirs.    The executors and trustees appeared and answered the bill, insisting that these lands constituted a part of the rest and residue of the estate embraced in the twenty-second clause of the will, and they also filed a cross-bill, setting up that, while there was no express power in the will to sell these lands, such power was given by implication, and asking the court to construe the will, and declare such implied power in the executors and trustees.    The court held that the lands were intestate property, and thereupon dismissed the cross-bill, and decreed a partition thereof under the original bill.    On appeal to this court, it was held, that the twenty-second clause of the will

was broad enough to include all the property of the testator, not otherwise disposed of, no matter where it was situated, and therefore that the lands in this State were a part of the rest and residue of the estate embraced in the residuary clause. It was also held that the residuary clause was not void as contrary to the laws or policy of this State against perpetuities, but was a valid disposition of the lands under our laws. Also, that there was no power of sale, either express or implied in the will. That portion of the decree of the court below dismissing the cross-bill was accordingly affirmed, but that portion of the decree granting partition was reversed, and the cause was remanded to the court below with directions to dismiss the original bill for want of equity.

The trustees and executors thereupon filed the present bill, seeking thereby to invoke the aid of a court of chancery in the exercise of its general jurisdiction over trust estates, and asking for a decree authorizing them to sell the lands in this State and convert the same into cash, and hold and re-invest the proceeds thereof upon the trusts declared in the will, the ground upon which such equitable relief is asked being, that the lands are so situated that it will be greatly for the interest of the estate and its beneficiaries to have the lands sold and the proceeds re-invested.

The bill alleges, in substance, that the lands in question consist of several tracts, containing in all about 190 acres, situate in the towns of Lake View and Jefferson, Cook county; that they are entirely unproductive and unimproved, and were bought by the testator as a speculation and with the intention of selling them without improvement; that a very large portion of the lands can not be made to yield an income, even for agricultural purposes; that it consists largely of sand ridges, and is not susceptible of cultivation, and is only valuable for sale and subdivision into lots; that it is not far from the city of Chicago, and is subject to heavy assessments for taxes, improvements and other charges; that the annual taxation is

very large, exceeding in one year the sum of $4500, and in one year the assessments upon the land amounted to about $30,000; that if sold in a prudent and proper manner, the lands will produce not less than $200,000, to be so invested as to yield a considerable income to the estate, to the great benefit of the estate and of the persons interested therein.

The bill further alleges that these lands are a portion of the rest and residue of the testator's property that, by the twenty-second clause of the will, must be and remain, in the control of the executors and trustees, well and safely invested, until the decease of the last life annuitant; that of the life annuitants, there are ten still living, of whom one is about twenty-six years of age, and two of the ages of forty and forty-five respectively; that in the opinion of the complainants, and of persons having intimate knowledge of real estate in the vicinity of Chicago, if the complainants are obliged to keep the land in question until the death of the last of the life annuitants, its whole value will be consumed in taxes and loss of interest, and it will during all that time be a heavy burden on the estate, seriously endangering the interests of the persons entitled to the income of the property, even if the complainants have a right to use a portion of the general income of the estate to pay taxes and assessments on these lands.

The life annuitants, ten in number, the two surviving children of the testator, his grand-children, of whom seven are in being, all the other beneficiaries under the will, those being all the persons interested in the testator's estate, were made parties defendant to the bill. Of the persons thus named as defendants, twenty-five in number, only three were minors at the time their answers were filed, those being Walter S. Hale and J. Frank Hale, two of the testator's grand-children, and Rufus B. Hale, a son of George K. Hale, one of the testator's brothers, and to whom a contingent devise and bequest is made by the twelfth clause of the will. All the defendants, with the exception of the three minors, and Benjamin P. Hale,

one of the grand-children who had reached his majority, appeared and joined in an answer, in which they admitted the equity of the bill and all the material allegations therein contained, and made for themselves the allegation that they believe that it is for the best interests of the estate, and of all persons who are or may become interested therein, that the real estate in question should be sold and the proceeds reinvested, and that they are willing and desirous that the court should authorize and direct such sale, in the manner and upon such terms as it should deem proper, and order the proceeds of the sale to be held subject to the trust of the will, in lieu of the real estate.

Defendant Benjamin P. Hale answered separately, admitting all the material allegations of the bill. A guardian *ad litem* was appointed for the three minor defendants, who filed for them an answer in the usual form, submitting their rights and interests to the consideration and protection of the court.

After the answers were filed, Edward Hale, one of the two surviving children of the testator, died, and by order of court, his administrator was substituted as defendant in his stead.

Replications to the answers being filed, the cause was referred to the master in chancery to take proofs and report the same with his conclusions. Proofs were subsequently taken, and the master, in the report of his conclusions, found the various allegations of the bill to be fully proved. That portion of his report bearing upon the condition of the property in question, and the desirability of having it sold and the proceeds re-invested, being, in substance, as follows :

That these lands are situated in that part of Chicago which was formerly the towns of Lake View and Jefferson, and comprise about 190 acres; that they were purchased by the testator in the year 1868 as a speculation and for the purpose of sale, and not for improvement or as a permanent investment; that it is all vacant and unimproved and consists largely of sand ridges not susceptible of cultivation; that a

very large portion of it can not be made to yield any income even for agricultural purposes; that the only income capable of being derived from it is the rental of such parts of it as are susceptible of cultivation; that the amount of rental which can thus be obtained is insignificant, as compared with the value of the land, and is not sufficient to pay more than a small part of the general taxes annually assessed thereon; that large and constantly increasing general taxes and special assessments for street improvements are annually levied on the property; that since the bill was filed, the trust estate has been compelled to pay large amounts for special assessments which were liens on the land, to prevent its sale therefor; that there are other special assessments, to large amounts, which are liens, and must be paid by the estate if it continues to hold the lands; that other very large special assessments for the improvement of streets, already opened and to be opened along and through the lands will be shortly levied on the same; that the annual income of the estate of the testator, after paying the annuities and other charges of the estate, is wholly inadequate for the payment of the taxes and special assessments so levied and to be levied on the property; that the sale of the lands for taxes and assessments can be prevented only by the sale of other property of the estate now yielding an income and applying the proceeds to their payment; that the lands have now reached such a salable value, that, in the opinions of persons competent to judge, their increase in value, if held by the estate, will not equal the interest on such salable value and the amount of taxes and assessments, and the interest thereon; that the estate can not hold them without great and increasing loss; that it is now a favorable time to sell them, and they can be sold at their fair value, so as to realize to the estate a large profit above their cost and interest; that if they be so sold, the proceeds can be invested in safe securities which will yield a large income to the estate, and the income so derived can be

in turn re-invested in like manner from time to time, so as to produce a further income to the estate, and thereby the interest on the proceeds of the sale can be annually compounded, to the great benefit of the estate; that unless such sale is made, the best interests of the estate and of all persons who are now or may be interested therein will be jeoparded, and that there is danger that a large part of the value of the land may be consumed in the payment of taxes and special taxes thereon, if the estate shall continue to hold it and pay the taxes and assessments which may be levied thereon; that it is for the best interest of the testator's estate, and of all persons who now are or may be interested therein, under the will, that these lands should be sold, and the proceeds invested by the trustees, subject to the same trusts upon which the lands themselves are now held by them. The master, upon these findings, recommended that the prayer of the bill be granted, and that a decree be entered in accordance therewith.

The cause afterwards came on to be heard on the pleadings and the master's report, and the exceptions to the report filed on behalf of Benjamin P. Hale and the three minor defendants, and at such hearing, the exceptions were all overruled, and the master's report was in all things approved and confirmed. A decree was thereupon entered, finding the facts as reported by the master, and finding that it is for the best interests of the testator's estate, and of all persons who now are or may be interested therein, under the last will and testament of the testator, that the lands in question be sold, and the proceeds derived from such sale held in place of the lands, and invested by the trustees under the will, and subject to the same trusts upon which the lands are now held by them. It was accordingly decreed that the trustees be authorized, empowered and directed to sell the land, either at one time or in parcels, or from time to time in such parcels as they should determine, and either at public or private sale, subject in all cases to confirmation by the court, and either for cash or

16—146 ILL.

partly for cash and partly on time, provided that when the sale should be partly on time, the cash payment should not be less than one-fourth of the agreed price, the deferred payments to be secured by mortgage or deed of trust on the land sold. Provisions were made in relation to the mode in which sales should be conducted, and reports thereof made, and for giving to parties aggrieved an opportunity to file objections to the confirmation thereof. Also for the payment of the purchase money to the trustees, to be held by them upon the same trusts in every respect as those upon which the lands so sold were held by them, the court reserving to itself the power to give further directions for the proper accounting for such proceeds by the trustees.

To obtain the judgment of this court as to the propriety of this decree, the record is now brought here by writ of error issued at the suit of the three minor defendants. For the same purpose, Benjamin P. Hale has sued out a separate writ of error, and brought to this court a duplicate transcript of the record. The questions presented by these two writs of error are identical, and they have therefore been submitted as one case, and will require no separate consideration.

The proceeding is not an adversary one in the ordinary sense. All the defendants who are *sui juris*, except Benjamin P. Hale, have admitted by their answers that it is for the best interests of the estate and of all interested therein that the lands in question should be sold, and have united in expressing their willingness and desire that a decree authorizing such sale should be entered. Benjamin P. Hale, in his testimony before the master, says, that he has investigated the situation of these lands, and is convinced, not only that it would be for the benefit of the estate and all interested in it to have them sold and the proceeds re-invested, but also that continuing to hold them would involve real danger, not only of great loss, but of possible disaster to the residue of the estate. The judgment of this court is sought by the plaintiffs in error, not so

much with the view of obtaining a reversal of the decree, as of having it sustained, if in our opinion it is maintainable, by the decision of the highest court in the State, so as to give greater security to the titles of those who may purchase under it, and thus enable the trustees to sell the land to the best advantage.

A suggestion is made by counsel for the minor defendants, as to whether the record shows sufficient service on them to give the Superior Court jurisdiction. The minor defendants are all non-residents of this State and service was made on them in the State of Massachusetts, by delivering to them and each of them a copy of the bill, together with a notice of the commencement of the suit, and the fact of service was proved by the affidavit of the person who made it. We have heard no suggestion, and we think none could properly be made, that the service, as shown by the affidavit, was not in full compliance with section 14, of chapter 22, of the Revised Statutes, entitled "Chancery," the only point submitted by counsel being, that the statute under which the service was attempted to be made can not be held to apply to infant defendants. The section referred to is as follows:

"The complainant may cause a copy of the bill, together with a notice of the commencement of the suit, to be delivered to any defendant residing or being without this State, not less than thirty days previous to the commencement of the term at which such defendant is required to appear; which service, when proved to the satisfaction of the court, shall be as effectual as if such service had been made in the usual form, within the limits of this State. The service by a copy of the bill may be proved by the affidavit of the person serving the same, made before any officer authorized to administer oaths in the place where the affidavit is made, or, in case the service is made in any foreign country, before any United States minister or consul residing in the country where the same is made."

We are unable to perceive any reason why this section should not be held to apply to infant non-resident defendants as well as to others, and none is suggested by counsel. It provides a mode of service upon "any defendant residing or being without this State," and gives to service made in that mode the same effect as when made in this State in the usual form. This provision manifestly includes infants as well as others.

The more serious questions presented by the record are, whether the Superior Court, in the exercise of its general chancery jurisdiction, had power to authorize the sale of the lands in question, and whether, under the facts appearing in this case, that power was properly exercised. If only the rights of the parties in interest who are *sui juris* were involved, these questions would be relatively simple. All the defendants, except the three infants, have expressly conceded that, as these lands are circumstanced, it will be for the best interests of the trust estate and its beneficiaries, to have the lands sold and converted into cash, and the proceeds re-invested and held, in that form, subject to the trusts declared in the will, and they express their willingness and desire that a decree to that effect should be entered. If then a court of chancery had the power to order the sale, the propriety of its action, so far as they are concerned, can not be called in question. The infant defendants, however, by reason of their legal disability, are able to concede nothing, and consequently, to sustain the decree as against them, all the facts necessary to justify it must be strictly made out by the evidence. In this view, therefore, the admissions and concessions of the adult defendants can not be considered.

Counsel, in their argument in support of the decree as against the infant defendants, submit the following propositions:

1. That the legal title to the land in question is vested in the executors and trustees, subject to the conditions and trusts created and declared by the will.

2. That a court of chancery has jurisdiction to authorize a sale of real estate, held in trust for infants or other persons under disability, and the re-investment of the proceeds, whenever it appears that it will be for the best interests of the trust estate that such sale and re-investment should be made.

3. That the evidence fully sustains the findings of the master's report and the decree, that it will be for the best interest of the trust estate and of all persons beneficially interested, that the property be sold and the proceeds re-invested.

4. That it is no objection to the decree, that other grandchildren not now in being may have an interest in the residuary estate.

These propositions would seem to cover all the substantial points of controversy in the case, and if they can all be sustained, the necessary result will be, that the decree authorizing a sale of the lands in question should be affirmed.

As bearing upon the first of these propositions, it must be conceded that there is no language in the will by which the fee or any other legal estate in these lands is expressly devised to or vested in the executors and trustees. By the first clause, they are appointed the executors and trustees of the will, but no words are used expressly vesting in them any particular estate. The twenty-second or residuary clause provides that the residue or remainder of the testator's estate, both real and personal, not otherwise disposed of, should be and remain in the care and control of the executors and trustees, and their successors, well and safely invested until the decease of the last survivor of the life annuitants, and that then, such residue and remainder, with all the accumulated interest thereof, be divided equally among the testator's grand-children. Here are no words directly devising the legal estate, and if such estate in fact passed to them, it can have done so only by implication arising from the character and scope of the trust, and the nature and extent of the power and authority over the trust property thereby conferred upon the trustees.

The rule is familiar, that where a will contains no words expressly creating a trust, or devising the legal title to the executors or trustees, such devise may be implied, where the powers conferred and duties imposed on the executors are of such a character, that a legal title is necessary to their proper exercise or performance. The general doctrine on this subject is very fully and satisfactorily stated by Mr. Pomeroy as follows:

"Although no trust is declared in express terms, or even mentioned, still the intention of the donor to create the trust, and the existence of the trust itself, may be necessarily inferred from the powers and authority given to the grantee, and in case of wills, even where no estate is directly devised to the executors, but the whole estate is apparently given to the beneficiaries, the trust may be necessarily inferred from the powers and authority conferred upon the executors, and thus from a construction of the entire will, the intention may be shown that the executors are to take the legal title as trustees of an express active trust. The peculiarity of this case is, that the trust arises, and the legal estate is vested in the trustees, although the will contains no disposition by which the legal estate is in terms devised to them. The doctrine is settled that, in dispositions of such a nature, although there is no devise in terms to them, the authority conferred by the will upon the executors to lease, rent, repair, insure, pay taxes, assessments, and interest, and otherwise manage the trust property, and to pay over the net income to the devisees or legatees, necessarily carries the legal title to the executors, and creates an express active trust in them. It is a familiar doctrine that where land is conveyed or devised to trustees, and they have active duties to perform, they take the legal estate; the converse is also generally true, that where active duties are prescribed for executors, which could not be performed unless the legal estate is vested in them, they are in

fact made trustees, and necessarily take the legal estate for the purposes of the trust." 2 Pomeroy's Eq. Juris. sec. 1011.

In *Wicker* v. *Ray*, 118 Ill. 472, a testator devised his estate in four equal parts, one-fourth to his daughter, one-fourth to his son, one-fourth to two grand-daughters, and one-fourth to his widow, and directed that the share of his daughter be so secured to her that she might enjoy it during her life and on her death to go to her heirs forever, and also that the share of the grand-daughters be in like manner secured to them, and gave his executors power to manage the estate for the best interests of all concerned, until a division should be made, and to sell depreciating stocks and property, and reinvest, when deemed proper, and it was held that the executors, by implication, took the legal title to the estate, in trust, to enable them to carry out the intention of the testator, and discharge the trust created by the will. For further illustration of the rule, see, *Tobias* v. *Ketchum*, 32 N. Y. 319; *Brewster* v. *Striker*, 2 id. 19; *Leggett* v. *Perkins*, id. 297; *Bradley* v. *Amidon*, 10 Paige, 235; *Deering* v. *Adams*, 37 Maine, 264; *Lindley* v. *O'Reilly*, 50 N. J. L. 636.

In the present case, we think it manifest from the entire scope of the will, that the testator intended to devise to his executors the legal title to his estate, for the use of the beneficiaries therein named. In the first place, they are appointed and designated, by the first clause of the will, not merely as executors, but as trustees, and the same designation is repeated in various clauses where reference is made to property, or the proceeds thereof, coming into their hands, to be held or disposed of. Especially is this true of the twenty-second clause, which provides that the residue and remainder of the testator's estate, real and personal, shall be and remain in the care and control of the executors and trustees, well and safely invested, until the decease of the last survivor of the life annuitants. The very use of the word "trustees" and the appointment of his executors to that position, furnishes of

itself a strong indication of an intention on the part of the testator, that his executors, after having performed the duties properly pertaining to the administration of the estate, should continue to hold the estate for the beneficiaries, not merely as custodians, but as trustees of an express active trust, and clothed as such with the legal title. It is difficult to see how, by any other construction, any proper force can be given to the word "trustees" so frequently and persistently used throughout the will.

It seems also to be the general scheme of the will that the estate should go into the hands of the executors and trustees, not merely for the purpose of administration, but to be held, cared for, controlled, invested and managed, for what may and probably will be a long series of years. In addition to the large sums given by way of specific legacies, most of which seem to have been paid, they are required to provide for and pay, from year to year, a large number of annuities, some for the lives of the annuitants, and others until the final division of the estate, which can not take place until after the death of the last life annuitant, an event probably many years in the future. During all this time, they are not only given the care and control of the entire estate, real and personal, which of course involves as a necessary incident, the means of defending the possession against all assailants, and of regaining it in case of wrongful disseizin, but they are also charged with the duty of keeping it well and safely invested. This latter duty clearly involves more than merely keeping the estate invested in such real and personal property as shall be least subject to deterioration or loss, without reference to the production of an income. If kept in that form, it may be said to be *safely*, but not *well* invested. The duty imposed upon the trustees is, obviously, to keep the estate, real and personal, invested in such way, as not only to be safe, but so as to make it produce at least a reasonable income. This duty, so far as the real estate is concerned, doubtless involves the power to

lease, and perhaps the power to improve, or to make such other use of it as prudent business management would suggest, for the purpose of obtaining from it rents and profits. Giving the trustees this measure of control over the estate, and imposing upon them duties of this character in relation to it, clearly constituted them trustees of an express active trust, and clothed them by implication with the legal title.

The next question is, whether the court below, sitting as a court of chancery, had the power, to authorize the sale of the lands in question and the re-investment of the proceeds. Decisions are to be found in the English reports which hold that courts of equity have no power, by virtue of their general jurisdiction over minors, to order the sale of the minor's real estate for the purpose of education, maintenance or investment, and that is probably the prevailing doctrine in England. The same rule seems to have been adopted by some of the courts of this country. The principal reason for denying this jurisdiction in England appears to be, that by changing the nature of the minor's estate from real to personal or from personal to real, the rights of third persons who will be entitled in case of the minor's death will be materially affected, as in that country real and personal property descend in different channels. That reason, it is very manifest, does not obtain in this country, as here, both species of property go by descent or distribution to the same persons. The interference of the court, therefore, in sanctioning a conversion of the property from real to personal or from personal to real, does not materially affect the rights of the persons who, in case of the minor's death, may become entitled to succeed to his estate. But even in England, cases are to be found where the power to authorize a change in the nature of the estate of minors has been exercised and upheld, where such changes were manifestly for the minor's benefit. See *Inwood* v. *Turner*, 1 Ambler, 417; *Earl of Winchelsea* v. *Norcliff*, 1 Vernon, 434.

In this country, from an early day, courts of the highest respectability have refused to follow the English rule, and have held that, where it is for the benefit of the minor, courts of equity have the power, by virtue of their general jurisdiction over the estates of minors and others under disability, to authorize a change from real to personal and from personal to real. This question arose in 1809, in *Huger* v. *Huger*, 3 Dessaussure, 18, decided by the Court of Chancery of South Carolina, and the court, after showing that the reason upon which the English rule was based did not exist in this country, reached the conclusion that it had the undoubted jurisdiction to authorize the change.

*In re Salisbury, a lunatic,* 3 Johns. Ch. 347, the question being whether a court of chancery had power to order a conversion of the real estate of a lunatic into personal, Chancellor Kent said: "It is settled that the property of a lunatic may be converted from real into personal, when it shall appear to be for the interest of the lunatic, without regard to the contingent interests of the real and personal representatives. The governing principle in the management of the estate is the lunatic's interest, not that of those who may have the eventual rights of succession." And by way of argument or illustration, the learned Chancellor said: "So, likewise, the court may authorize a change of the property of infants from real to personal, and from personal to real, when it is manifestly for the infant's benefit."

The same doctrine has been repeatedly reaffirmed by the courts of New York. Thus, in *Cochran* v. *Van Surley*, 20 Wend. 364, decided by the Court of Errors, it was said: "It is a settled principle, that whenever the property of infants consists of real or personal estate, the legal title to which is in trustees, the chancellor, as the general guardian and protector of the rights of all infants, may authorize such a disposition thereof, as he, in the exercise of a sound legal discretion, may deem most beneficial to such infants, provided the rights

of other persons are not prejudiced thereby. The only restrictions upon that power are those which the court has from time to time imposed upon itself, in the nature of general rules to regulate the exercise of such discretion, and those imposed by certain provisions of the revised statutes." See also, *Anderson* v. *Mather*, 44 N. Y. 249; *Pitcher* v. *Carter*, 4 Sandf. Ch. 1; *Wood* v. *Mather*, 38 Barb. 473.

In *Ex parte Jewett*, 16 Ala. 409, it was held that where it is manifestly for the interest of an infant, a court of chancery will authorize a sale of his real estate, but before it will do so, the facts which render the sale necessary must be alleged and proved, so that the chancellor may clearly see that the interest of the infant will be thereby promoted. This principle was reaffirmed in *Rivers* v. *Durr*, 46 Ala. 418, and *Goodman* v. *Winter*, 64 id. 410.

In *Snowhill* v. *Snowhill*, 3 N. J. Eq. 20, the court in discussing the same question, said: "Courts of equity may, and not unfrequently do, change the character of property. They will permit trustees or guardians to do it, when it is manifestly for the advantage of the infant. They will convert the property of a lunatic from real into personal, for his interest, and this has frequently been done without reference to the contingent interests of real or personal representatives."

The decisions in this State bearing upon this question have uniformly been substantially to the same effect. In *Smith* v. *Sackett*, 5 Gilm. 534, it was said: "The jurisdiction of the Court of Chancery to order the sale of the whole or a portion of the estate of an infant, or to order it to be incumbered by mortgage, whenever the interest of the infant demands it, will not be denied, whether the interest be of a legal or an equitable nature." That was a bill filed in behalf of an infant, to establish his equitable title to real estate, subject to lien for purchase money, and praying for a sale or mortgage of his interest for the purpose of raising the money to redeem from the lien. The court having sustained the infant's equitable

title, held that as he was without means to make the redemption, a court of chancery, in the exercise of its general jurisdiction over the estates of infants, had power to authorize the mortgage or sale of the property, for the purpose of making redemption.

In *Curtiss* v. *Brown*, 29 Ill. 201, the question was whether a court of chancery had jurisdiction to order the sale of certain real estate conveyed to a trustee to hold during the joint lives of a married woman and her husband, upon a trust to pay the rents and profits to her, during such joint lives, for her sole and separate use, without power on her part to sell, mortgage, charge or otherwise dispose of the same by way of anticipation, and on the death of her husband, in case she should survive him, then to her and her heirs forever, but with power to her, in case she should die in the lifetime of her husband, to dispose of the same by will, or in default of a will, then to her heirs forever. A bill was filed, the husband and wife joining therein, alleging that the property had become of great value, but was so situated as to be unavailable and unproductive to her, and that her interest would be promoted by a sale or mortgage, and an application of the proceeds to some productive property or business pursuit; that the complainants had applied to the trustee to make such sale or mortgage, and that he had refused to do so, on the ground that, by the terms of the deed, the property was to remain in his hands until all the contingencies therein mentioned had occurred. A decree was entered in accordance with the prayer of the bill, and a sale of the property was made thereunder. It was held that the court had jurisdiction, and that the decree and sale were valid.

In *Dodge* v. *Cole*, 97 Ill. 338, upon bill filed by the conservator of a lunatic, a decree was entered directing the sale of certain unproductive real estate belonging to the lunatic for her maintenance. The validity of such decree being called in question in this court, it was held that the court of chancery rendering it had inherent jurisdiction, independently of any

statute, to direct the conversion of the real estate of the lunatic for her benefit.

In the last two cases above cited, the questions involved are discussed at considerable length, and in both, the jurisdiction of courts of chancery to order the conversion of the real estate of infants, when it is for their interest that such conversion should be had, is recognized as a settled proposition, and the reasoning of the court proceeds, to a considerable extent, upon analogy to what is declared to be the established rule in relation to the jurisdiction of courts of chancery over the estates of infants.

In *Allman* v. *Taylor*, 101 Ill. 185, certain infants residing in Indiana, by their guardian appointed in that State, filed their bill in chancery in this State, alleging that they were the owners of certain unimproved and unproductive land in this State, and praying for a decree for its sale for the purpose of raising money to satisfy an incumbrance on land belonging to them in Indiana. A decree was entered and a sale made in accordance with the prayer of the bill, and the validity of the decree being afterwards collaterally called in question, this court, in sustaining the decree and sale, held that a court of equity, by virtue of its general powers, has jurisdiction over the estates of infants and others under disability, and may, on proper application, order the sale of an infant's unproductive real estate, to raise money for such purpose as that stated in the bill in that case. In the opinion, *Smith* v. *Sackett*, and *Dodge* v. *Cole, supra*, are cited as settling the law in this State as to the questions decided in those cases. See also, *Longworth* v. *Riggs*, 123 Ill. 258.

The very large value of the lands in question in this case, and the great importance to the parties of the interests involved, have induced us to make a more extended review of the authorities bearing upon the proposition now under consideration than was perhaps necessary, in view of what already appears to be the settled law of this State. We need therefore

only add, that the power of courts of chancery, by virtue of their general jurisdiction over the estates of infants, to authorize the conversion of their real estate into personal, where it is clearly for their interest that such conversion should be made, is not only supported by the general current of authority in this country, but is so thoroughly settled by the former decisions of this court as to be no longer an open question in this State.

The facts tending to show that it was for the best interests of the beneficiaries of the trust estate to have the lands sold and their proceeds re-invested and held in their stead, as those facts are alleged in the bill and found by the master, have already been stated. We are of the opinion that they are sufficient to justify the decree, and we have examined the evidence with care, and are satisfied that the findings of the master are fully sustained. These lands, at the time they were purchased by the testator, were suburban property, deriving most of their commercial value from being in the immediate vicinity of the city of Chicago. They are now within the boundaries of the city, being a portion of the territory recently brought into the city by annexation. The rapid extension of the city in the direction of these lands has brought them within the sphere of ordinary city improvements, and is now subjecting them to those enormous burdens which the opening, construction and paving of streets, the construction of sewers, and the making of other municipal improvements over new territory, necessarily involve. The lands are of little value for any purpose except for subdivision into city lots, and whether they are subdivided or not, the necessities of the growing and extending city have already required, and will continue to require, the opening and construction of streets, alleys, sewers and other city improvements upon and across them, the cost of which is being and will continue to be imposed, by assessment and special taxation, to a very large extent, upon the lands themselves. The assessments already imposed upon them for these

improvements have become very large, so as to aggregate in one year nearly $30,000, and the evidence warrants the conclusion that the improvements which are now in contemplation, and which in all probability will be made in the near future, will impose upon these lands a burden of assessment and taxation amounting to many times that sum, and equaling if not exceeding their present value. A portion of these improvements, such as street pavements, etc., will doubtless require renewals at intervals, and perhaps several times before the final division of the estate.

But even the expenditure of these large sums of money will not, so far as can now be anticipated, place the property in a condition in which it will be capable of producing an income to the estate. That can be done only by expending other large sums of money in the erection of buildings for dwelling-house or other purposes, or in otherwise adapting the property to use, expenditures which, if the trustees should be held to have the power to make them, would doubtless exhaust many times the available resources of the estate. It follows that to keep the lands, involves leaving their present market value, which the evidence tends to show is about $700,000, together with perhaps an equal sum to be expended in the payment of municipal assessments and general taxes, invested where it will be substantially unproductive of any income, until the death of the last life annuitant, when the estate can be divided. No argument is needed to show that keeping the lands, under the circumstances, will not be promotive of the best interests of the beneficiaries of the estate, but will impose upon the estate heavy burdens which, so far as can now be foreseen, will be attended with no adequately compensating advantages.

Of the life annuitants, nine were living at the date of the decree. Of those, one was then of the age of forty-five years, another forty-seven, another sixty, the other six being older, their ages ranging from sixty-eight to eighty years. According to the Carlile tables, the expectation of life of the youngest

at that time was about twenty-five years, and of the next youngest, about twenty-four years. But the doctrine of chances, as applied to the two together, would raise a probability that the survivor of them would live beyond the limit thus fixed. Still, however that may be, the probabilities upon which the court was compelled to act in arriving at its decree were, that at least twenty-five years would be likely to elapse before the estate, by the terms of the will, could be divided between the testator's grand-children. It is manifest that holding this valuable property for such long period of time, in a form in which it will not only be unproductive of an income, but is certain to involve a large and perhaps a continual expense, would not only be unwise as a business proposition, but might ultimately prove disastrous to the entire estate. A sale of the land and a re-investment of the proceeds is clearly in the interest of those who may ultimately become entitled to the estate on final distribution.

The remaining question submitted is, whether it is a valid objection to the decree, that there may be other grand-children of the testator, not now in being, who will have an interest in the residue of the estate, at the time it is divided among the residuary legatees. It is not disputed that all persons *in esse,* who have any possible interest in the estate, were before the court, and among them, the seven grand-children now in being. If other grand-children should hereafter be born, their equitable rights in the estate will be precisely the same nature, or will in fact be identical with those of the grand-children who were parties defendant, and who were brought before the court for the protection and defense of those very interests.

It is unquestionably a general rule, subject however to certain well recognized exceptions, that in proceedings in equity, the interests of parties not before the court will not be bound by the decree. But among the exceptions is one growing out of convenience or necessity in the administration of justice, which has given rise to what is known as the doctrine of repre-

sentation. Thus, where it appears that a particular party, though not before the court in person, is so far represented by others, that his interests receive actual and efficient protection, the decree may be held to be binding upon him.

A familiar illustration may be found in cases where the parties are so numerous that it is inconvenient or impossible to bring them all before the court, and it appears that they all stand in the same situation, and have one common right or one common interest, the operation and protection of which will be for the common benefit of all, and can not be to the injury of any. Under such circumstances, the bill is permitted to be filed by a few, on behalf of themselves and all others, or against a few, and yet bind the rights and interests of all others. Story's Eq. Plead. sec. 126.

Another illustration may be found in cases where there is real estate in controversy which is subject to an entail, where it is generally sufficient, all the parties having antecedent estates being before the court, to make the first tenant in tail *in esse*, in whom the estate of inheritance is vested, a party with those claiming prior interests, without making any persons parties who claim in remainder or reversion of such vested estate of inheritance. And it will make no difference whether the bill is brought by or against such tenant in tail, as he will in each case be equally the representative of the subsequent estates and interests. And a decree for or against such first tenant in tail will generally bind those in remainder or reversion. Story's Eq. Plead. sec. 144. See also, *Gifford* v. *Hort*, 1 Sch. & Lef. 386; *Finch* v. *Finch*, 2 Ves. Sr. 491; *Leonard* v. *Sussex*, 2 Vern. 527; *Reynolds* v. *Perkins*, Ambler, 564; *Wills* v. *Slade*, 6 Ves. 498; *VanLew* v. *Parr*, 2 Rich. Eq. 321; *Bofil* v. *Fisher*, 3 id. 1; *Baylor* v. *DeJarnette*, 13 Gratt. 152; *Faulkner* v. *Davis*, 18 id. 651.

In Calvert on Parties in Suits in Equity, 19, the doctrine of representation, considered as an exception to the general

rule requiring all persons in interest to be made parties, is stated as follows: "It is a rule founded upon the advantage which all persons interested will derive from the completeness of the decree, and from the entire settlement of the matter in litigation; in other words, it is founded upon convenience; and the same principle guides our courts of equity in the mode of putting the rule into operation, as they never allow it to produce any inconvenience which can safely be avoided. With this view they have adopted the principle of representation. Persons may be required as parties either on account of something personal, as, for instance, having done certain acts of fraud or collusion, or, like officers of corporations, as possessing certain knowledge; or else because they are the owners or guardians of certain interests which the suit will affect. Upon grounds of the first nature, they must appear in their own persons. If the proceedings concern the individual responsible for the fraud, or possessed of certain information, they can not be equally conducted in the presence of some other persons appearing on his behalf. On the other hand, if the general rule requires a person to be present merely as the owner and protector of a certain interest, then the proceeding may take place with equal prospect of justice, if that interest receives an effective protection from others. It is the interest which the court is considering, and the owner, merely as the guardian of the interest; if then some other persons are present, who with reference to that interest, are equally certain to bring forward the entire merits of the question, the object is satisfied for which the presence of the actual owner would be required, and the court may, without putting any right in jeopardy take its usual course, and make a complete decree. 'The general rule,' says Lord Eldon, 'established for the convenient administration of justice, must not be adhered to in cases in which, consistently with practical convenience, it is incapable of application.' Instances of this kind are scarcely to be quoted as exceptions to the general

rule; the absent party appears by his representatives, his interest is protected, his claim is enforced."

Especially is this doctrine applicable where the persons not before the court are only possible parties not *in esse*, and where the interests of all parties in being require a decree which will completely and finally dispose of the subject matter of the litigation. Such possible parties can not as a matter of course be brought before the court in person, and it would be highly inconvenient and unjust, that the rights of all parties in being should be required to await the possible birth of new claimants until the possibility of such birth has become extinct. If persons in being are before the court who have the same interest, and are equally certain to bring forward the entire merits of the question, and thus give such interests effective protection, the dictates both of convenience and justice require that there should be a complete decree.

This view is strongly supported by the authorities. Thus, in *Faulkner* v. *Davis*, 18 Gratt. 651, the court say: "This rule of representation often applies to living persons, who are allowed to be made parties by representation, for reasons of convenience and justice, because their interests will be sufficiently defended by others who are, personally, parties, and who have motives, both of self interest and affection, to make such defense, and it is therefore considered unnecessary to make such living persons parties, and, indeed, improper to do so, and thus compel them to litigate about an interest which may never vest in them. But the rule also, often, and *a fortiori*, applies to persons not in being, and who, of course, may never be in being, who are allowed to be made parties by representation for reasons, not only of convenience and justice, but of necessity also, because it is impossible to make them parties personally."

So also in *Bofil* v. *Fisher*, 3 Rich. Eq. 1, it was said: "But the question is, whether the court has the power, by its decrees, to alienate the contingent titles of unborn remainder-

men, who, from the nature of things, can not be made parties, or be represented in the proceedings before the court; or to alienate the contingent titles of persons, who, though *in esse*, are resident in other States, or in foreign lands, whose residences, and even whose names are unknown. To say that the court could not, under circumstances like these, convey away the fee, would be to assert a doctrine that would render conditional limitations and contingent remainders an intolerable evil to a growing and prosperous community. Thus to shackle estates without the power of relief, unless every person having a contingent and possible interest could be brought before the court, would be to sacrifice the rights and interest of the present generation to those of posterity, and of citizens to aliens. If the whole property of the country were thus situated, it is obvious that all improvement and advance would be completely checked." See also the cases above cited, and *Mead* v. *Mitchell,* 17 N. Y. 210; *DeLeon* v. *Barrett,* 22 S. C. 412; *McArthur* v. *Scott,* 113 U. S. 340; *Mead* v. *Mitchell,* 5 Abb. Prac. 92; *Dodge* v. *Cole,* 97 Ill. 338.

In the present case, the decree makes the same disposition of the rights of the grand-children not in being, as it does of those who are in being and who were made defendants to the bill. Of those who were thus made defendants, part were adults, who answered and defended for themselves, and part were minors, who answered by their guardian *ad litem,* and thus referred their rights to the consideration and protection of the court. The rights of those *in esse* and those not *in esse* are protected by the decree in precisely the same way and to the same extent. In case of neither are those rights defeated or denied, but they are expressly affirmed, the effect of the decree being, to authorize the conversion of the lands in this State into personal property, and when such conversion is made, it merely transfers the equitable rights of all these residuary beneficiaries from the land to the fund which will be created by their sale. In all this, the grand-children not

*in esse* have been fully represented, and their rights have been fully defended and protected by those in being. The decree therefore must be held to be valid as a conclusive disposition of the rights of all the beneficiaries, as well those not *in esse* as those who were made defendants to the bill by name.

The query is raised by counsel for the appellants as to whether the decree sufficiently protects the rights of the infant defendants, but no specific objection to the form of the decree is pointed out. The decree makes detailed, and so far as we can see, proper and judicious provisions as to the manner and terms of the sale, requires a report of each sale and its confirmation, with opportunity to file objections, and provides that the proceeds shall be held and invested by the trustees under and subject to the trusts declared by the will, and also expressly reserves to the court the right to give further directions as to the accounting by the trustees for such proceeds. We are unable to see wherein the rights of the minors are not fully protected. If further directions to the trustees in relation to the future administration of the fund should be required for the proper protection of the rights of the minors, sufficient power and discretion remain in the court below to supply them, and the proper relief in that respect, if any is needed, may be obtained by application to the supervisory powers still remaining in that court, rather than by seeking to have the decree as already made reviewed here on writ of error.

We are of the opinion that under the facts appearing in the record, and the rules of law applicable thereto, the decree is correct and proper, and it will therefore be in all respects affirmed.

*Decree affirmed.*